We'll hear argument next this morning in Case No. 15-290, the United States Army Corps of Engineers v. Hawkes Company. Mr. Stewart. Mr. Chief Justice, and may it please the Court, a jurisdictional determination issued by the Army Corps of Engineers does not file agency action because it does not order any person to do or refrain from doing anything and does not alter anyone's legal rights and obligations. The jurisdictional determination, or J.D., expresses the Corps' opinion about whether a particular tract contains waters protected by the Clean Water Act. That stated opinion may affect the recipient's assessment of the options available to it, but it does not affect the actual legal status of those options. This Court's precedents make clear that the practical effects on which Respondents rely are not a sufficient ground for treating an agency communication as final agency action. Now, the Respondents primarily emphasize the practical impact that the Corps' jurisdictional determination would have upon themselves, the recipients and the intended audience. And they say the jurisdictional determination indicating that the Corps believes there are waters of the United States on the property will force them to choose among three unattractive options. One would be seeking a permit, which could be an expensive process and wouldn't be, by any means, certain to succeed. The second would be discharging pollutants, discharging fill onto the property and taking their chances in a future enforcement action. And the third would be playing it safe, foregoing development entirely. And the problem with Respondent's argument is that that choice would have existed before the jurisdictional determination was issued. It would have existed if the Corps had never adopted its practice of issuing jurisdictional determinations upon request. It's simply a choice that is posed by the Clean Water Act. Alito, if there were a provision of law saying that a jurisdictional determination by the Corps or by the EPA is binding on the Federal government in future litigation, would that be reviewable? I think if the statute said that, we would have a very different case, because in that case we would have something much closer to Bennett v. Speer. In Bennett v. Speer, the Court was dealing with a biological opinion issued by one Federal agency, the Fish and Wildlife Service, to another Federal agency, the Bureau of Reclamation, and it included an incidental take statement. And the terms and conditions of the incidental take statement affected the legal options that were available to the Bureau of Reclamation. Well, it would be a different case, but are you able to say whether that would be reviewable under the EPA? Yes. I think if the Corps' jurisdictional determination were legally binding upon the EPA, if it foreclosed the possibility of an enforcement, of an EPA enforcement action that was inconsistent with the terms of the jurisdictional determination, yes, we think that the JD would be judicially reviewable. But I think it's important to point out how far removed that is from the actual statute before us. That is the case. There is no such statute. That certainly is true. But there is a memorandum of understanding between the Army and the EPA, and it says, quote, "'Case-specific determinations,' and I think that includes jurisdictional determinations, made pursuant to the terms of this Memorandum of Understanding will be binding on the government and represent the government's position in any subsequent federal action or litigation regarding the case.'" So is your – would your argument be that because this is in a memorandum of understanding as opposed to a statute or a regulation, the situation is different and that is insufficient to make the jurisdictional determination reviewable? That would be one argument. But the other argument, and I think we've made this point in the reply brief, that particular memorandum of understanding was dealing with what are referred to as special case determinations. There are situations occasionally arise where the agencies perceive at the outset that there could be dicey questions, there could be questions of coverage on which the Corps and EPA might disagree. And since 19— Robertson, I'm sorry to stop you right there, but I don't think that's right. I'm looking at the memorandum as well, and it says in Section 2 – oh, I'm sorry, 4C2, it describes non-special cases. It says, "...for those projects not involving a special case, the DE, in other words, the district engineer, the Army Corps, not EPA, the DE shall make final determinations and communicate those determinations without a requirement for prior consultation with EPA." So while it talks about the division of authority between special cases and the mine run cases, it certainly says something about non-special cases. That's what Section 2 is titled, non-special cases. But we understand the language about the ultimate determination being binding on the government in subsequent litigation as referring to special case determinations. Well, but I don't see how you can do that. I'm looking at, you know, 6A. It says, "...all final determinations must be in writing and signed by either the DE, either the Army Corps person, or the regional administrator, the EPA person." And it says that those will be binding on the government and represent the government's position in any subsequent Federal action or litigation concerning that final determination. It is referring to those that are referring to all final determinations by either the Army Corps of Engineers or EPA. I take it we're looking at the 1989 memorandum of agreement? It's the one, yeah, the one you cite in footnote 3 of the reply brief. Where you say that it does not address mind-run core jurisdictional determinations. I think we would still think of the general, the final determinations as referring to special case determinations. But even if the memorandum of underground Just to pause there, how can you do that when it says all final determinations signed either by the district engineer, who does not have authority over special case cases, or the regional administration, or administrator? How can you read that as applying only to the special case determinations? Well, it is saying final determinations of the DEA or RA made pursuant to this MOA, which is referring to, which is a MOA that is referring specifically to special case determinations. Yes, this MOA decides what's a special case and what's not, and it tells you what happens when it's not. So I just don't see how you can say that talks only about special cases. I think even if the memorandum is read that way, if the memorandum is read that way, I don't think it reflects current government policy. It doesn't reflect the current understanding of the core in EPA, and I don't want to Well, that's fine. Give me an example of a case where the government has gone after someone, absent change circumstances, who's had a negative J.D. in hand. Any situation past pre-memorandum, post-memorandum where you've actually taken the Army Corps' determination and said we're going to go after this person anyway? I don't know that it's ever happened, and I certainly don't want to suggest that it's The fact that you're reserving your power is enough, even though by this memo and practice you've never done it? You think that that's not within Bennett's second prong? It's not within Bennett's second prong in the same way that in Franklin v. Massachusetts the practice of the President had always been to transmit the figures and do the apportionment in accordance with the figures that were prepared by the Secretary of Commerce. But the Court said that what mattered was there was no legally binding obligation on the President to do that. I would also say that independent of the possibility of an EPA enforcement action, there is a more realistic possibility of a private citizen suit. The fact that the Corps concludes that jurisdictional waters are not present wouldn't preclude a citizen suit from being filed, challenging that premise of the discharge activity. The question is, I think, whether it's final with respect to the Corps' determination, not with respect to whether somebody else might be able to bring a suit. And I think what Justice Sotomayor is suggesting is that in practice and what I was suggesting in law, this is final with respect to the Corps. And that would be the first prong of Bennett. That is, even with respect to the Corps, it is still subject to reexamination if somebody presents new information, if in the course of a permitting process the applicant asks the Corps to reconsider its prior jurisdictional determination, the Corps is not going to reconsider it sua sponte during the 5-year period while it remains effective. Roberts' What seems to me that what you are arguing, then, is that there are exceptions to what is otherwise a safe harbor. It's not intended to be — I mean, first of all, the jurisdictional determination that we're talking about here, the one that's actually being challenged, was one that concluded that jurisdictional waters were present. And it's clear that that sort of jurisdictional determination has no binding effect on anyone. The landowner is still legally free to disagree and to discharge the bill. Roberts' Well, a great, a great practical risk. I mean, the Corps comes in and says these are jurisdictional waters. And you say, yeah, well, you can go ahead. You can still dump and do everything you want and take your chances that there will be a different ruling later on down the road. And the other thing, I agree that it is a legally available alternative, but I agree a practically difficult one. The other alternative that the property owner has is to seek a permit to discharge Phil lawfully. And the permitting process, that really is the mechanism that Congress designed to allow people to get an advance ruling on the legality of their discharges without subjecting them to a penalty. Ginsburg's argument is, I shouldn't be under this Clean Water Act at all, and now I have to go through this whole process that's going to take years and cost me a lot of money. And I think the legal or legal system confronts that type of problem and that type of tradeoff in a lot of different contexts. For example, that was exactly the argument that Standard Oil made in FTC v. Standard Oil. The FTC had commenced an administrative proceeding in which Standard Oil was charged with violating the law. And there was, I believe the phrase was reasoned to believe, there was a statutory threshold that the FTC had to surmount before administrative proceedings could be initiated. And Standard Oil's complaint was, I should be able to challenge the initiation of the proceedings because it will put me to great expense to defend against them, and it will impugn my reputation. Breyer. Sometimes it doesn't, but I joined Bennett, and the reason I joined it is it says in the second prong, or from which legal consequences flow. So I would assume that nothing in Bennett, or I would have dissented, is intended to overrule what I think is the great case on the matter, which is Abbott Labs. And Harlan in Abbott Labs explains completely and thoroughly what this Court has done in Frozen Food Express, what the Court did in Storer, and on the point you're now making, what he says specifically is the ICC order is ripe for review, even though it would have no effect, until later someone decided to bring a particular action. He says that in Storer, the commission policy determination is ripe, even though it would not issue a television license, that's what the policy said, even though no specific application was before the Court. So it wouldn't take effect until later. And the same thing was true, precisely, of the order in Abbott Labs itself. It was a statement of interpreting what the commission would do, and nothing was going to happen. Nothing happened, unless later on somebody decided to violate it, much like this. And even if they violated it, nothing would happen, unless the commission decided to prosecute. So what Justice Ginsburg said was, once this is in effect, okay, the commission has to decide now what happens. The person who is subject to it has to take certain steps because of the law. One, spend $150,000 to try to get an exception and fail, or two, do nothing, violate it, and possibly go to prison. Those sound like important legal consequences that flow from an order that, in respect to the agency, is final, for it has nothing left to do about that interpretation, and, B, is perfectly suited for review in the courts. So we have harm flowing from a change in legal relations, we have an agency that has nothing left to do on this particular matter, and we have a court that is perfectly suited to review it. I would say it flows from Abbott Labs almost, QED. So what is your response to that? Stewarts. Well, with respect to Abbott Labs specifically, excuse me, Abbott Labs dealt with a regulation that essentially required that on each instance where the trade name of the drug appeared, including on the labeling, the generic name of the drug had to appear as well. And the regulation, as rules typically do, was phrased as a directive. It said manufacturers shall do this. It was a legal command. In Standard Oil, the Court dealt with, said in various contexts, we have held that regulations are immediately reviewable as final agency action, although the Court engages in a separate rightness discussion. The second thing I would say about Bennett is the Bennett court, I think, was quite careful not to rest its decision on the practical impact that the order would have on the recipient. It rested its decision on the fact that the biological opinion constrained the legal obligation options available to the Bureau of Reclamation, because only by complying with the FWS's terms and conditions could the Bureau of Reclamation get the immunity from Endangered Species Act liability that it wanted. The third thing I would say, and to return to my prior point about FTC v. Standard Oil, it happens a lot in the law that we are confronted with a situation like this, where a particular government decision is made, be it an agency order, a district court order that denies a motion to dismiss for lack of subject matter jurisdiction or for failure to state a claim on the merits, and the losing party, the person who gets the immediate review of this, because if I don't get immediate review, then even if I'm vindicated at the end of the day, I will be put to substantial burden and expense in the meantime. Sotomayor, may I ask you, please don't panic by asking this question, and please don't resist it, because I know all your arguments resisting it. But assuming we disagree with you, that this should be appealable, what's the narrowest way to write this that the government would like? Stewart. I guess if the Court ruled against us on the ground that it understood the EPA and the Corps to have entered into a binding agreement such that the EPA would be foreclosed from taking action based on its disagreement with the Corps' jurisdictional determination, I think if that were the gravamen of the opinion, it would be one that if the agencies wanted to fix it, they easily could simply by issuing a new MOA clarifying their view of the J.D.'s effect. Kagan. On the same lines, can I ask more generally? I mean, one of the reasons I find this case very difficult is because all over the Federal government there are compliance officers of various kinds whose function is to give advice to people. And often that advice comes with very specific recommendations. It says, we will not take enforcement action if, or we do not consider it a violation of law on the following facts. And I guess what I want to know is your view of how this program compares to various other kinds of programs like this, whether it's the tax opinion letters or SEC opinion letters or FCC or whatever, how this program compares to those and where you could draw sensible lines, because mostly we want government agencies to do these things. We think that this helps people to actually know what the government thinks about particular factual situations. So how do we draw lines in this area, in your view? Well, I mean, I guess part of the difficulty I have with your question is, or I should say, I think if you were drawing lines, the jurisdictional determination at issue here would be fairly far removed from anything that ought to be judicially reviewable, because in many of the instances, the informal advice that agencies are giving, it is specifically advice about the legality, the perceived legality or illegality of specific contemplated private conduct. Somebody may come to the agency and say, I'm thinking about doing X. Would that be legal or illegal? And the agency might say, we think that that would be one or the other. The likelihood that an agency would say to somebody that's legal and subsequently pursue an enforcement action is the same. Kennedy. I think underlying Justice Kagan's question is that the Clean Water Act is unique in both being quite vague in its reach, arguably unconstitutionally vague, and certainly harsh in the civil and criminal sanctions it puts into practice. And what's the closest analogous statute that gives the effective party so little guidance at the front end? Well, I think with respect to the vast majority of sites in this country, it's readily apparent whether the Clean Water Act applies. That is, and this point is somewhat removed from the actual facts of this case, but it happens all the time that at construction sites around the country, industrial parties will dig up a lot of dirt and deposit it somewhere else, and they're doing something that would be illegal if it occurred in waters of the United States, but nobody thinks there's a problem, because in the vast bulk of its — in the vast bulk of locations, there really isn't a quandary. And if you imagine a statute that said before you can do anything like that, you have to come to the core and get advance assurance that these are not waters of the United States, it would be exponentially more burdensome. I take your point that there are certainly a significant range of tracks where the application of the Act is authentically ambiguous. But the thing I would say about that is Congress has designed the permitting process. There are other statutes in which regulated parties have no statutory mechanism for getting an advance ruling as to the legality of their conduct. They have to either do it and take their chances or forego it, or perhaps seek informal advice from the agency. Alito, let's say in a case where there hasn't been a stand-alone jurisdictional determination and the landowner applies for a permit, the first part of the permitting process, as I understand it, would be a jurisdictional determination. Is that right? That's correct. Okay. And at the end of that, can the landowner get judicial review if the determination is that it is subject to the Clean Water Act? Or does the landowner have to go forward, in your view, with the entire pro — all the rest of the permitting process before there's a possibility of an administrative appeal and judicial review? I think it would still have to go through the rest of the permitting process. And part of the point for that is it may be that during the rest of the permitting process, the landowner will have no prospect except perhaps in an administrative appeal of persuading the court to reexamine its jurisdictional determination. But that requires the permitting process a legal consequence under the second prong of Bennett. It's not a legal consequence because the landowner always has the legal option of discharging without a permit if it feels sufficient. And he goes to jail. I mean, you put in your brief, and he risks it. In your brief, and I think that the point raised, of course you — it's a good idea to give people advice. Abbott Labs takes care of that. One of the three important features of Abbott Labs is you look at it from the point of view of the agency, and you say how formal is it, what was there left to be done. And in this case, we have a whole set, a whole part of the CFR which is devoted to this, which goes to very — it's called jurisdictional determination from instructional guidebook. The Army Corps of Engineers is brought in. Once they make a determination, it's called the agency's official view. It's stated it remains in effect for five years unless conditions change. And you in your brief say that the issuance of an approved jurisdictional  So that doesn't sound like someone giving informal advice. And there's an appeals process. It sounds like a formal system of answering a question, which question is, are these lands wetlands Federal or not? Now, if it was some kind of informal advice, fine. You'd come to a different result. But I've just listed the things here that suggest it isn't at all formal. It's a five-year formal, definite, procedurally guided CFR determination. I would agree that the process that culminates in the approved jurisdictional determination is much more formal and elaborate than the process that would usually culminate in the kind of advice letters that Justice Kagan is talking about. All right. Well, if that's so, we have the other part of the problem. But I don't think that the formality of the process really has much to do with the basis on the practical basis on which respondent wants to get into court. That is, if this had been a much less formal document, but it had still manifested the CORE's view that jurisdictional waters were present, I think respondents would say they would be under exactly the same practical pressure, either to go It isn't just the practical pressure. It's both. And the concern on the other side, beyond the EPA, is this is a vast Federal Government, and this vast Federal Government can operate, can issue many, many formal determinations on aspects of the statute. And if people are, people are required to follow those without court review on penalty of going to jail, if they don't just follow it or paying hundreds of thousands of dollars to judicial review. That, I think, is also a public policy question. I agree that it's a public policy question, but as I was saying about Standard Oil and the same principle applies to our legal system's general resistance to interlocutory appeals within the judicial system. That is, it happens all the time that a motion to dismiss is denied. The party who thinks that the complaint ought to be dismissed could say to an appellate I will have to pay hundreds of thousands of dollars litigating this case to its conclusion before I can achieve potentially Ginsburg's opportunity to certify the question, to say it's interlocutory, but there's a good reason why it should go up immediately. So there's nothing like 1292b here. There's nothing like 1292. I mean, there is the permitting process. There is an alternative mechanism to get into court and during the jurisdictional determination, you – well, first, can you explain to me why the – under the Clean Water Act, it's done this way. It's not you can request advice and we'll give you advice. That's what we think now, but it's not binding. It's a deliberate attempt to make this determination formal and binding on the agency. This is opposition. It's a final adjudication of opposition on the jurisdictional question. I think it is formal, and the court doesn't revisit it because it usually – sui sponte, because it would usually seem like a waste of time unless somebody had presented the core reason. But why was it done this way, to make it a formal adjudication rather than we'll give you advice? I don't know why the formality, including the administrative appeal, was provided. I think it was intended as a service to landowners, that the core wanted to give the best advice. The only other thing I would say about it is that it's not binding on the agency. Ginsburg. Was there anything in it for the EPA or the core? I mean, I understand we want to inform the public of the agency's position, but is it all altruism or is it – was there a reason that the EPA or the core wanted it done this way? It certainly has benefits to the enforcement agency in the sense that if landowners receive what the core believes to be accurate information about their property, the likelihood of their complying will be greater. As Justice Kennedy, I believe, was pointing out, the preparation of a jurisdictional determination would be the first step in the permitting process if one was entered into. Sotomayor, in regular litigation, there is an inducement potentially for one or other party to appeal to delay the resolution of the case. In this situation, I don't see that inducement as existing, meaning I doubt very much that landowners are – who want to use their property for a particular purpose – are going to appeal just for the – just to delay the government's adjudication of an issue that's going to either permit them or not permit them to go forward. I would agree there's less danger of manipulative appeals. There is still a real danger of duplicative appeals, because you could have an appeal on the jurisdictional question. The court says the core's jurisdictional determination was not arbitrary and capricious. Now you go through the permitting process and there's a separate suit about whether the terms and conditions were too over. If I may, I'd like to reserve the balance of my time. Sotomayor, thank you. Roberts, thank you, counsel. Mr. Hopper. Hopper, thank you, Mr. Chief Justice, and may it please the Court. We read the MOA to be binding in every way. We have found not a single word. Sotomayor, I can't help you for very long, because he just said they'll change it. So is that the argument that you want to rely on? I'm sorry? He just said before that if we rule that way, they could just change it. They'll just eliminate the MOA. Well, it's existing today, and in addition to the MOA, the fact that this is a site-specific adjudication suggests that this is a binding determination. In fact, that's the very purpose of an adjudication. Also, as has already been mentioned, it represents itself as being the official view of the agency, the final agency action of the agency, and will be relied on for 5 years. Even during the permit process, that will not be revisited. All of those things suggest that this is a binding adjudication, and that's why we want to rely on it and not change it. And Mr. Hopper, can I ask, you know, I was just looking through some other agencies' rules and practices, and I'll just give you a couple of examples. The FCC put out rules just this past year. And it says, with respect to some particular matters, the FCC rules say the Bureau will not bring an enforcement action against a requesting party, a requesting party, meaning somebody who requested an opinion, with respect to any action taken in good faith reliance upon an advisory opinion, if all of the relevant facts were fully, completely, and accurately presented to the Bureau. Now, there's another that I just came across. It's in just a standard SEC, Securities and Exchange Commission, opinion letter. And it says, based on the facts presented, the division will not recommend enforcement action to the commission. So I guess my question is, this appears to happen all over the place around the Federal Government, people setting up offices whose specific purpose is to say, come to us, tell us your problem, and we are going to give you a view, and not just a view. We're going to essentially commit that if you have told us the truth, here is your  And I guess I want to know what's different about this than any of the other cases in which the Federal Government does that, for good reason, because people want to know these things. What you're describing, Your Honor, is what is what we would be referred to in this case as a preliminary jurisdictional determination. The regulatory process has built into it the option of the Federal Government getting an advisory, informational, preliminary jurisdictional determination to be issued to the applicant that is nothing more than advisory. It's not binding and can't be appealed. And these are, this is very strong language that are in these letters. We will not recommend action. We will not bring an enforcement action. So, you know, just as you say, they basically said to us, we were in the clear if we passed this. So do these letters. That is strong language, Your Honor, but not as strong as an adjudicative determination where rights and obligations are actually decided. In this particular case, the process is so formalized and purports to be final and purports to be binding that it's quite distinguishable from the situation that you are describing. Kagan Let me ask you about that, because that's certainly, this process does last a long time, and it's, even Mr. Stewart, I think, would say this is a more formal process than many that exist around the Federal Government. But I guess I'm wondering about the incentives of the kind of distinction that you would make, because it would suggest, you know, that agencies should not draw back, should not give a fully informed view, should not do the fact-finding that the board, that the court does here. You know, should just make their processes less formal, but in making their processes less formal, also less accurate and less helpful. And I guess I wonder who that benefits in the end. Stewart Well, I think that the agency has more to lose than the landowner has to gain by refraining from issuing these kind of formal adjudications. They indicate that they issue about 54,000 permits, and most of them, and they permit, 54,000 nationwide permits, and about 3,100 individual permits, and of those only eight have ever been appealed administratively. So there's really no incentive for the, for the government here to, you know, to draw back on this formal adjudicative process, because in almost all cases, the landowner is simply going to defer to the agency on jurisdiction. And that would be my response to you on that. Kagan Well, I guess I don't quite understand that, because it seems as though they could make it less formal and they could provide less assurance, and still there would be very few people who would want to run the gauntlet. And so you wouldn't gain anything. All you would do was to lose something. And what you lose is accurate, reliable information provided to people about whether, in fact, these waters are, fall within the Clean Water Act. Stewart Well, that's the problem, because until there has been the, because the, the Clean Water Act is so difficult to, to, because under the Clean Water Act it is so difficult to determine the reach of the Act, and it can only be done through expert analysis, you would never get the kind of detailed, reliable information that would define the scope of jurisdiction if you didn't have such a formal process, which would never occur in the type of generalized ruling that you've suggested, like through the preliminary J.D. The preliminary J.D. says we think you may have waters in the United States on your property. The approved jurisdictional J.D. says just the opposite. We've made a definitive determination. You can rely on that. You're obligated to get a permit, and you have a right to use property that is not subject to the waters of the United States. Kennedy Tell us, just so it's in the brief, what's the cost to get a J.D. determination in a case such as yours? Second, can the agency, if we adopt the sort of rule that you want, simply decline to give jurisdictional determinations? Stewart All that's required in order to receive a jurisdictional determination under the regulatory guideline is to ask. And under the regulatory guideline, the agency is required to respond. The language says the Corps will give a formal approved jurisdictional determination if one is requested, even if they don't request it in that specific language. Ginsburg The point was made earlier that in court proceedings, you have a jurisdictional question. You may think that the Court was very wrong, but apart from 1292b, you are stuck there. You may have to go through a lengthy trial, and that's just too bad. It is a complete adjudication of the jurisdictional question. The Court's not going to return to it. Even so, you don't get any kind of appellate review until there's a final judgment on the whole case. Why should this be any different? Stewart I'm not sure that I follow your question, Your Honor. Would you please repeat that? Ginsburg Well, you are urging that you should have you should be able to challenge in court this jurisdictional determination, right? Stewart Immediate judicial review. Ginsburg And if you were in a district court, you would have no immediate right to challenge a jurisdictional determination. So why should this situation be different in the agency setting and in the court setting? Stewart That's the whole question at issue, Your Honor, is whether we can get district court or judicial review. Ginsburg But if you were in the district court and the district court made a jurisdictional determination, you are in our power, and you disagree, and you think the case should be you should be allowed to be free to do what you will, and but you've lost on the jurisdictional issue, you have to stay there. The equivalent would be going through the permitting process. Stewart We don't know why we would not be able to appeal that, Your Honor. There would be a purely legal question on summary judgment. We could appeal it as we asked. Ginsburg A summary judgment, you'd have to take a judgment on the whole case. You can't appeal an adverse ruling on jurisdiction. You want to get out of the case? We don't believe that we need to go through the permit process. Breyer The question is why. Why? I think if I understand the question, you go into district court, you say we're from Alaska and here we are in Florida, and we don't belong here, there's no jurisdiction, and the court says you're wrong. Now, that means you have to stay there, you have to go through the whole proceeding, it's going to cost you $1 million. It's going to take a long time, but you don't get independent review of the jurisdictional question. So I think the question is, if I may say it, is why doesn't that apply here, too? Because this is just like one part of the whole thing. Nothing's like the jurisdictional question. Scalia In what sense is it one part of the whole thing? Breyer Under Abbott Labs, this Court made the determination that if one is in this catch-22 situation, this no-win situation, where even no action results in great loss because you have to, you're going to have to go through the whole process, you're going  to have to, your option is to only abandon the project at great loss, or go for a permit at great cost, or subject yourself to an enforcement action at great cost, that that type of Hobson's choice is sufficient to get you judiciary review. Alito But do you see any distinction between a jurisdictional determination by an Article III district judge and a jurisdictional determination by an enforcement agency? Do you think there might be an argument that it is tolerable to wait until the end of the case when a neutral Article III judge makes an adverse judicial or an adverse jurisdictional determination, but perhaps less appealing to wait until the end of the case when a judge makes an adverse judicial or an adverse judicial determination by an enforcement agency? Well, an adjudication has already been made. There's no further adjudication to be made unless you're talking about requiring a permit prior to judicial review. And that's what we find objectionable, Your Honor. That's not an adequate remedy in court. A more general way to ask this question. I mean, there's no doubt that some people face themselves in real predicaments when they're looking at the — when they're trying to figure out what to do under the Clean Water Act. But, of course, you know, that's true with respect to many regulatory statutes. And I think what Mr. Stewart's point was, was that the predicament is the same regardless of the J.D. process. If the J.D. process didn't exist, your client would be facing the exact same predicament. And, indeed, the J.D.'s — the J.D. process's reason for being is that it's supposed to help people in dealing with this predicament, because it's supposed to provide them with information that they wouldn't otherwise have. Exactly. Well, that seems to be a good reason for Mr. Stewart to prevail in this case. Because the predicament is the predicament, and it's a predicament that comes from the Clean Water Act. The J.D. process is — the only thing it's supposed to do is to give you more information so that you can make the choices that the statute puts to you. It does more than that. Under — under Bennett, Your Honor, the second prong of finality is satisfied if any of three requirements are met. Number one, a right is — is determined or an obligation is determined or legal consequences flow. By virtue of the adjudicative determination in this case, an obligation has been established that the — that hawks cannot use 150 acres of their property without being obliged to get a permit. They also have to be — Well, that's the question, is whether there's any obligation or whether there's — it's simply information about what will happen given different courses of action. The Clean Water Act itself doesn't say anything about this particular property. And the Clean Water Act doesn't cover all waters. And the only way to find out if there are jurisdictional waters which will trigger the requirement for a permit is to go through this laborious, site-specific analysis. Kagan. That seems right, but it's also why people go to the Treasury Department for tax letters, and it's also why people go to the SEC for advice about what they can and cannot do with respect to securities. And it's also — I mean, there's a hundred different examples. I'm not aware of them, all those examples, having an appeals process that results in a final agency action that, by treatment and regulation and practice, constitute a binding conclusion. Well, the premise of the question is that the Army Corps of Engineers is doing this just out of the goodness of its heart, that this is a lot of work for them, but they just want to be nice to landowners, and that's why they've set up this — this process. And maybe that's correct, although I understood what you were saying earlier, to suggest that that's not quite how you see the process, that they do this for their own purposes because they — it expands their enforcement power, because landowners who have a question about the status of their land have a strong incentive to ask for a jurisdictional determination, and if — so that alerts the Corps to the property that might be subject to their jurisdiction, and if they issue a negative — I'm sorry, an affirmative jurisdictional determination, as a practical matter, that's going to mean in most instances that the project is shut down. Is that your argument? Yes, and even further than that, this is really a problem of the agency's own making. When Congress passed the Clean Water Act, it prohibited discharges to navigable waters, and as this Court addressed in Rapanos, that's so broadly interpreted now that it covers virtually any wet spot in the country. It isn't just — that isn't the — the issue, I think, is this — what I thought your answer would be is that informal advice is not final agency action. Normally, there is a statute. It was passed in 1946. It's called the Administrative Procedures Act. It tries to divide such things with that word final as rulemaking by the agency, from accomplishing roughly the same result by never having a rule but just telling everybody informally what the agency will do in such circumstances. It might be that the formal is, other things being equal, final agency action in respect to that matter. It might be that the latter is not. So I think what you're telling me is what I should do next is go read those Federal rules and regulations and see, is this more like informal advice or is it more like formal rulemaking? And you have the latter and they have the formal, I guess. I don't know. And I go and make up my mind. I guess that's my job in this instance. Roberts. Well, to help make up your mind, we would refer you to frozen foods, which you've already mentioned. Yeah, yeah. I mean, if frozen foods, Starr and Abbott Labs and Bennett, too, are examples of what falls on the formal, final side of the line, a few other things will be on the other side of the line. And in fact, if frozen foods is virtually indistinguishable from this case, frozen foods was essentially a jurisdictional determination case. Well, Mr. Hopper, can I ask, do you think that this would count as a formal adjudication under the APA? Yes. A formal adjudication under the APA? Yes. There was a the agency applied the law to a specific set of facts, had a formal hearing, and issued a final ruling. It's not formal. Would it then receive Chevron deference? Oh, I'm sorry. Well, not in that sense, no. Yeah, not in that sense, no. I wouldn't think so in that sense. I wouldn't think it's a formal adjudication and I wouldn't think it would receive Chevron deference. And, you know, there's a very fine opinion by Judge Sutton on this question. And he basically says the kinds of things that are not final, the kinds of advisory type rulings that are not final, are the ones where there's no Chevron deference given, that that's the proper line to draw. Those that's when you know that there's a kind of formality to it that should count with respect to the question of finalness. Well, the we have met in every way the finality standards of the Bennett Second Prompt. We have identified right that has been determined, an obligation which has been determined. We've talked about legal consequences flowing. All of those, any one of those satisfies the finality standard, and therefore under the APH, to give us review. Kennedy, what's the best example of a legal effect that follows from a jurisdictional determination, as opposed to a practical effect? It seems to me that the practical effects are quite enormous. What's the legal effect? Increased risk of enforcement, because the very existence of the JD constitutes prima facie evidence of a violation if one were to discharge without a permit. That sounds to me practical, not legal. I think that is legal, Your Honor. Also, I would suggest, as this Court recognized in Sackett, that this jurisdictional determination increases the risk of civil and criminal liability. Does it affect the determination of willfulness on the part of the landowner? It does, in two respects, Your Honor. When the Court is looking at, and the agency, at civil penalties, the Clean Water Act requires that the Court look at the good faith efforts, and by extension, the bad faith efforts. And now that we have a formal determination that these are waters of the United States, there is a knowing violation which brings in potential criminal sanctions against the landowner. Significant. Kagan. Kagan. I'm sorry, please. Yes. Isn't that true in every case of an opinion letter, whether it's from the government or for, actually, from a private party? You know, there's always cases in which people say you had an opinion letter. It said X. You did Y. Or, conversely, I had an opinion letter. It said X. I did X. I mean, that happens all over the place in litigation with respect to every single compliance, piece of compliance advice that the government gives. Yes. With the one exception that the weight that the Court is going to give to those types of opinions and suggestions is much different than what the Court will give to a final determination as to jurisdiction after having gone through a formal appeals process. So the weight is quite different. And let me also make a comparison between this and Sackett when this Court considered whether double penalties would apply in that case. You might recall that during oral argument, Mr. Stewart said that with respect to double penalties, that is, there will be $37,500 a day assessed because of a violation of the statute, and then $37,500 a day because of a violation of the compliance order. He said that that reading of the law was entirely theoretical and didn't even know if it would even fly. Here, we don't have a theoretical risk. We have an actual risk. The Clean Water Act says a knowing violation shall result in a civil fine of no less or a criminal fine of no less than $5,000 and no more than $50,000 a day, and will increase the prison time from one to three years. So even though you're right, a simple letter may put one on notice, it certainly doesn't have the same weight as a final binding determination. The main problems we have with the requirement of going through a permit process before one can seek judicial review under the APA are fourfold. First of all, the permit process adds nothing to the jurisdictional question. It doesn't add any facts which are relevant, and it doesn't clarify the law. It's simply an idle act which the law abhors. Secondly, it puts the timing of the judicial review entirely in the hands of the APA. It is an open-ended invitation to the agency to delay forever the final permit issuance, denying the landowner a right to ever have judicial review. That was important to this Court in Sackett when this Court was looking at whether an enforcement action, if you could instigate an enforcement action, whether that would be an appropriate remedy. And this Court said it wasn't because the landowner may be able to commit a violation that has no control over when the enforcement action would follow. So the fact that there's no control in the landowner as to when the judicial review would occur, we think is violative of the APA. The APA suggests immediate judicial review is required. That falls under the presumption of reviewability. That's the intent of Congress. Once finality has been established, it seems to me that the Court should be looking at ways to facilitate judicial review and not find ways to deter it or delay it or obviate it. Ginsburg's response to your argument on the part of the agency is, well, we didn't have to get into this in the first place. There's no statute that required us to hold these jurisdictional to make these jurisdictional determinations, so forget it. Your client is exposed to the very same things under the statute, right? So because the agency has provided something that at least is some benefit to the public that served, it becomes subject to immediate review, whereas if we had done nothing, all we had was the statute, then your client is still left with the same choices, right? You might recall, Your Honor, that this is a 12b motion where we take the facts as asserted in the complaint as correct, and the complaint suggests that this jurisdictional determination should never have been issued, that the waters on this particular property are not waters of the United States, and a negative jurisdictional determination should have been issued. So that's a unique result of the jurisdictional determination and does not follow from the statute. Under the statute, we should be exempt under the jurisdictional determination, and we have to get a permit. Roberts, I thought your answer might focus on the fact that this is of great benefit to the agency, because by issuing the determinations, they are able to exercise extraordinary leverage without going through the formal enforcement process. So it does give them – it is a way for them to exercise their authority without effective judicial review, and that's a significant enforcement tool for them, so they might be unwilling to give it up if they had the option. I think there's no question they're not going to give it up. They have nothing to lose. In almost all cases, the recipient of the jurisdictional determination defers to the judgment of the agency. As you say, it is used for leverage. In fact, I would even say to extort mitigation from an individual that they could never do if they could establish, through judicial review, whether there are jurisdictional waters on the site. So I agree with you. I think that that's one of the problems. We also think one of the difficulties with going through the permit process is the cost. Not that the cost is definitive, but if the cost is prohibitive, then it raises a problem because you can't – it raises, I think, a potential due process problem. I think it raises another problem of practicality. Sotomayor How do I determine how much is too much? I mean, for some people, given their financial situation, $3,000 is too much, and for others, I don't know your client's financial wherewithal, but $10,000 would be reasonable. So when do we decide how much is too much? Well, I don't think it's a question that needs to be answered generally, because it can be answered specifically in this case. In this particular case, the landowner has been asked to provide over $100,000 in additional studies. You might recall that the applicant actually started the permit process and was willing to go through the permit process until it became unreasonable and too cost prohibitive to proceed, and that's when they asked for the jurisdictional determination. Thank you, counsel. Mr. Stewart, two minutes. Thank you, Mr. Chief Justice. First, with respect to the cost of the permitting process, there's no basis for assuming that the permit process is systematically unavailable. As Mr. Hopper was referring to, the core statistics indicate that a little over 50,000 general permit authorizations and a little over 3,000 individual permits are granted each year. The process may be expensive in individual cases, but it is a process that is regularly invoked and regularly invoked successfully. And in many instances, if the core and the landowner come to an agreement, the core offers to permit the activity on terms and conditions that the landowner regards as acceptable, that may obviate the need for a court ever to resolve the question whether these were jurisdictional waters. And that's the kind of consideration that is often invoked as a justification for not submitting interlocutory review, that the issue on which a person seeks immediate review may turn out not to be necessary to resolve after all. With respect to the analogy to district court litigation, I think in standard oil, this Court has already taken the step of saying the same principle applies to administrative adjudication. My point in analogizing to district court litigation is simply that this is not a quirk of administrative law. This is a fundamental precept of our legal system, that on the whole, we are more worried about piecemeal litigation than about deferred litigation. Finally, formality is not the key. In Franklin and in Dalton, the agency process at issue were intensely formal, intensely structured, and they were designed to have an effect on the President's decisionmaking. They were held not to be final agency action because they were not legally binding on the President. And the same thing is true here with respect to the binding effect of the jurisdictional determination on the recipient. Thank you. Roberts. Thank you, counsel. The case is submitted.